## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **TOBIN DON LEMMONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CIV-13-494-D** |
| | ) | |
| **MICHAEL HOUSTON, JEFF TROUTT,** | ) | |
| **JANET DOWLING, KATRYNA FRECH,** | ) | |
| **GENESE MCCOY, SAMMIE KENYON,** | ) | |
| **JAMES HOWARD, DR. SHRINER,** | ) | |
| **JOSEPH SMASH, DOES,** | ) | |
| **LEONIDES BERMEJO, CHERIAN** | ) | |
| **KARUNAPUZHA, LORI IRWIN, GREGG** | ) | |
| **BROOKS, KENYA SACKETT, FELICIA** | ) | |
| **HARRIS, ROBERT PATTON, and JUSTIN** | ) | |
| **JONES.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, a state prisoner appearing *pro se* and *in forma pauperis,* brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. (ECF No. 25) (Second Amended Complaint). United States District Judge Timothy D. DeGiusti has referred the matter to the undersigned magistrate judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B)-(C). Before the Court is the alternative Motion to Dismiss or Motion for Summary Judgment filed on behalf of Defendants Brooks, Dowling, Frech, Harris, Howard, Kenyon, McCoy, Patton, Sackett, Smash and Troutt.

(ECF No. 66). Plaintiff has responded. (ECF No. 86).[1] For the reasons set forth below, it is recommended that the Motion to Dismiss/Motion for Summary Judgment be **GRANTED in part and DENIED in part.**

## I.      BACKGROUND AND ISSUES PRESENTED

Plaintiff's Second Amended Complaint consists of four counts brought against defendants in their official and individual capacities. In Count I, Plaintiff alleges certain defendants, both at Lexington Assessment and Reception Center (LARC) and the James Crabtree Correctional Center (JCCC) were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. He further alleges state-law claims of negligence regarding the medical treatment he received while incarcerated at LARC and JCCC. (ECF No. 25:6).

In Count II, Plaintiff alleges denial of his Sixth Amendment right to access the courts as well as his Fourteenth Amendment due process rights, based on his allegation that defendants, particularly Defendant Frech, blocked his access to the Department of Corrections (DOC) grievance procedure by intercepting his Requests to Staff (RTS) and returning them unanswered. (*Id.*).

---

[1] On January 29, 2015, the undersigned granted, in part, Defendants' Motion to Strike Plaintiff's 611 page verified response (ECF No. 86) to their Motion to Dismiss/Motion for Summary Judgment. Most of Plaintiff's Response consists of duplicative or irrelevant exhibits. (ECF No. 93). The undersigned has considered the 58 pages of the Response as an Affidavit in opposition to the motion for summary judgment. Relevant medical records, copies of grievance procedures, and grievance documents are attached to the 553 page court-ordered Special Report filed under seal to protect Plaintiff's privacy. (ECF No. 67)

In Count III, Plaintiff contends generally that his rights under the Fourth, Fifth, Sixth, and Eighth and Fourteenth Amendments, as well as his right to privacy regarding his medical records under the Health Insurance Portability and Accountability Act (HIPAA), were violated when DOC provided medical records to defendants in a state lawsuit against the Pawnee County Jail. (*Id.* at 12).

In Count IV, Plaintiff alleges various defendants denied him access to the courts when he was attempting to file an action in the Alfalfa County District Court pursuant to the Oklahoma Tort Claims Act (OTCA). (*Id.* at 13).

## II. FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

### A. STANDARD OF REVIEW FOR MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556); *see also Gee v. Pacheco*, 627 F.3d 1178, 1184 (10th Cir. 2010). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties

might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

Additionally, to state a claim in a case brought pursuant to 42 U.S.C. § 1983, a plaintiff must plead sufficient facts to demonstrate "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. 662 at 677. Well-established Tenth Circuit law comports with the holding in *Iqbal*. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997); *see also Jenkins v. Wood*, 81 F.3d 988, 994-995 (10th Cir. 1996) ("[P]laintiff must show the defendant personally participated in the alleged violation, and conclusory allegations are not sufficient to state a constitutional violation.") (internal citation omitted); *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (§ 1983 liability must be predicated on an official's personal involvement in the constitutional violation). As for supervisory liability, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676; *accord Pahls*, 718 F.3d at 1225.

## B. Claims Subject to Dismissal Based on Immunity from Suit

### 1. Eleventh Amendment Immunity

Plaintiff has sued all defendants in both their individual and official capacities requesting both compensatory and punitive damages. (ECF No. 25:3). With the

4

exception of Defendant Irwin, all defendants are identified as state employees of DOC. All official capacity claims against all defendants identified as DOC employees must be dismissed; the claims are barred by Eleventh Amendment immunity.

"To state a claim under [42 U.S.C.] § 1983 a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Neither a state, a state agency, nor an official of the State acting in his or her official capacity, is a "person" for purposes of § 1983. *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 64, 71 (1989). *See also Branson School District RE-82 v. Romer*, 161 F.3d 619, 631 (10th Cir. 1998) (when suit is brought against a state official in his official capacity, the real party in interest is the state). Thus, Eleventh Amendment sovereign immunity precludes suits against states, state agencies and state officials sued in their official capacities.

Unlike other jurisdictional issues, a State may waive the defense of sovereign immunity. The State of Oklahoma has not, however, waived its sovereign immunity defense against § 1983 claims brought in federal district court cases. *See Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 589 (10th Cir. 1994). It is therefore recommended that all official capacity claims seeking monetary damages against all DOC defendants in their official capacities be dismissed with prejudice.

### 2. Judicial Immunity

Lori Irwin is the Clerk of the Alfalfa County District Court. The claims against her, liberally construed, appear to be woven into Plaintiff's contention that he was denied access to the courts. But a court clerk performing a judicial act, or one having an integral relationship with the judicial process, must be afforded the defense of immunity. The Tenth Circuit explained why judicial immunity extends to court clerks.

> This is because, practically speaking, a clerk must have unfettered discretion to review a complaint or other pleadings supporting the issuance of a summons to determine whether the requisite filing requirements have been met and a summons should issue. In such a case, the defense of judicial immunity should generally apply, regardless of procedural error, motive or good faith.
>
> To hold otherwise would have a chilling effect on the judicial duties and actions of the clerk, who would be readily subject to suit in the course of performing his or her duties[.]

*Coleman v. Farnsworth*, 90 F. App'x 313, 317 (10th Cir. 2004) (internal citations omitted.

It is recommended the claims against Ms. Irwin be dismissed.

### 3. Other Claims Subject to Dismissal

### a. Claims Subject to Dismissal on Screening

Defendant Does (unknown defendants) are not named in the caption of Plaintiff's Second Amended Complaint and have never been identified or served. The claims against them should be dismissed on screening for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. §§ 1915A and 1915(e)(2)(B)(ii) (pertaining to actions brought in forma pauperis).

Defendant Jones, who has not been served, was sued in both his official and individual capacities. But the only claims against Defendant Jones were based on his having formerly been the "Director for the [DOC]." (ECF No. 25:3). Defendant Robert Patton, successor to Defendant Jones as Director of DOC, was substituted for Mr. Jones as to the official capacity claims. (ECF No. 30). The individual capacity claims against Defendant Jones should be dismissed on screening for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915A(b)(1) and (1915(e)(2)(b)(ii) (pertaining to actions by plaintiff's proceeding in forma pauperis), because Plaintiff has failed to allege Mr. Jones personally participated in the alleged constitutional violations.

### b. Personal Participation

In his Second Amended Complaint, Plaintiff names defendants Janet Dowling, Genese McCoy, Sammie Kenyon, and Gregg Brooks. The claims against these defendants are primarily based on their having answered or otherwise handled Plaintiff's requests to staff, grievances, and grievance appeals.

Allegations against a defendant based solely on his or her denial or rejection of a request to staff, grievance or grievance appeal does not state a claim upon which relief may be granted. Merely denying grievances or requests to staff does not constitute "personal participation" that will support a cause of action under § 1983. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

Ms. Dowling is identified as the Warden at JCCC. Under DOC's grievance procedure, she is the Reviewing Authority for non-medical grievance appeals at the facility level.[2] (Special Report [SR]. Exhibit 4 at 89) The only participation alleged against Ms. Dowling, other than vague references to her being aware of Plaintiff's medical treatment in her position of Warden, is that she handled one Request to Staff (RTS), which was improperly addressed to her by Plaintiff. (ECF No. 25:3,15). Thus, Ms. Dowling had no personal participation in the alleged constitutional violations, and the claims against her should be dismissed

Ms. McCoy is identified as the Medical Services Administrator for the DOC. In her position as the Administrative Review Authority (ARA), she or one of her staff is responsible for reviewing and answering grievance appeals. The review of the ARA is the final step in the grievance procedure. Her only involvement in this case was to handle Plaintiff's grievance appeals and improperly filed Requests to Staff. Under the Grievance Procedure, no RTS should be submitted at this level of review. Based on Plaintiff's continual abuse of the grievance procedure, even after having been warned, Ms. McCoy placed him on grievance restriction. (*Id.* at 4); (SR Exhibit 8 at 132). Ms. McCoy had no personal participation in the alleged constitutional violations, and the claims against her should be dismissed.

---

[2] Grievance appeals related to medical issues at the facility level are handled by the Correctional Health Services Administrator, in this case Defendant Katryna Frech.

Sammie Kenyon is an employee of the Department of Corrections Medical Services Administration. Plaintiff improperly submitted an RTS to Ms. Kenyon dated December 29, 2011. Ms. Kenyon replied to the RTS on February 21, 2012, informing Plaintiff that an RTS should not be sent to the administrative review authority. (SR Exhibit 6 at 123). Despite having been warned of a possible grievance restriction, Plaintiff sent another RTS to Ms. Kenyon dated February 24, 2012. Plaintiff complained about being threatened with a grievance restriction. (SR Exhibit 8 at 130-131). The RTS was forwarded to Ms. McCoy who informed Plaintiff that the RTS was improperly submitted. Because of Plaintiff's continued misuse of the grievance procedure, Ms. McCoy informed Plaintiff that he would be on grievance restriction for twelve months in accordance with the grievance procedure policy. (*Id.* at 132). Claims against Ms. Kenyon should also be dismissed for lack of personal participation.

Gregg Brooks is identified as the Deputy Warden of JCCC. He answered one RTS from Plaintiff regarding mail room procedures. (ECF No. 25:4, 14). Plaintiff has alleged no personal participation on the part of Mr. Brooks, thus, Plaintiff's claims against him should be dismissed.

In sum, it is recommended the claims against these defendants be dismissed for failure to state a claim upon which relief may be granted. The dismissals should be with prejudice because allowing Plaintiff to amend his complaint would be futile. *Knight v. Mooring Capital Fund, LLC,* 749 F.3d 1180, 1190-91 (10th Cir. 2014) ("[D]ismissal under Rule 12(b)(6) is not reversible error when it is patently obvious that the plaintiff could

not prevail on the facts alleged and allowing [her] an opportunity to amend [her] complaint would be futile.") (quoting *McKinney v. Okla. Dep't of Human Servs.*, 925 F.2d 363, 365 (10th Cir. 1991) (citation and internal quotation marks omitted (alterations in original)). Further, "[a] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

### III. SUMMARY JUDGMENT AS TO MEDICAL CLAIMS

#### A. Standard of Review for Summary Judgment

Summary judgment shall be granted where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party. *Calhoun v. Gaines*, 982 F.2d 1470, 1472 (10th Cir. 1992); *Manders v. Oklahoma*, 875 F.2d 263, 264 (10th Cir. 1989). A dispute is "genuine," when viewed in this light, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. After the movant has fulfilled his initial burden of showing an absence of a genuine issue of material fact and entitlement to judgment as a matter of law, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact. *Whitesel v. Sengenberger*, 222 F.3d

861, 867 (10th Cir. 2000). The nonmoving party "may not rest upon mere allegations" in his pleading to satisfy this requirement. *Anderson*, 477 U.S. at 256. Rather, Federal Rule of Civil Procedure 56 "requires the nonmoving party to go beyond the pleadings and by … affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56).

Because the undersigned has relied on the documents attached to the court-ordered Special Report (SR) in determining the disposition of Plaintiff's medical claims, defendants' motion regarding such claims is treated as a motion for summary judgment. *See* Fed. R. Civ. P. 12 (d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

## B. Count I: Negligence and Deliberate Indifference to Serious Medical Needs

Plaintiff was transferred to DOC custody from the Pawnee County Jail on August 23, 2011, and sent to LARC. Plaintiff alleges he arrived at LARC with a 23 year history of tonic clonic seizures as well as psychogenic, non-epileptic seizures (PNES) (also referred to as pseudoseizures). Plaintiff's psychogenic seizures appear to be triggered by stress and anxiety. Other health problems included degenerative disc disease; foot pain; hepatitis C; and abdominal pain, none of which were treated at LARC. According to Plaintiff, he advised intake personnel at LARC about his medical conditions, but he

was not allowed access to the seizure medications he had been taking. (ECF No. 25:7). As the medical records demonstrate, Dr. Houston[3] did, in fact, discontinue Plaintiff's Neurontin[4] (SR Exhibit 15 at 194). A different doctor at LARC prescribed Doxepin, however, and this prescription was continued when Plaintiff was transferred to JCCC. (*Id.*). Plaintiff states he had a tonic clonic seizure on August 26, 2011, fell from the top bunk, and injured his head and right elbow. (ECF No. 25:7). After the seizure, Dr. Houston issued an order for Plaintiff to be restricted to a bottom bunk, but he did not prescribe medication to control Plaintiff's seizures. Plaintiff states he continued to have seizures while at LARC.

Plaintiff was transferred to JCCC on September 7, 2011. (*Id.*). Three defendants were involved in his care: Joseph Smash, Ph.D. is the JCCC psychologist, and Dr. James Howard is the facility's psychiatrist. Dr. Smash provided psychological counselling for Plaintiff and set up appointments with Dr. Howard for medical intervention with psychotropic drugs. Both doctors were attempting to help Plaintiff control his psychogenic seizures. Dr. Jeff Troutt is the facility's medical doctor. Dr. Troutt was

---

[3] Defendant Houston, identified as a doctor at LARC, has not been served. Plaintiff was given two extensions of time to do so. (ECF Nos. 52, 63). Plaintiff was specifically notified that failure to serve Dr. Houston in the allotted time period could result in dismissal without prejudice of claims against Dr. Houston. (ECF No. 52). It is recommended that Plaintiff's claims against Defendant Houston be dismissed without prejudice for failure to timely effect service of process, pursuant to Fed. R. Civ. P. 4(m).

[4] Neurontin is prescribed to control seizure activity. The generic formulation, Gabapentin, was sometimes prescribed to Plaintiff and is frequently mentioned in the medical records. Both terms are used in this document, as both the original and generic formulations were prescribed during the time period at issue.

responsible for Plaintiff's medical care. Plaintiff's chief complaint against Dr. Troutt is his delay in prescribing Neurontin to control Plaintiff's tonic clonic seizures and his discontinuation of Neurontin against the advice of neurology consultants.

### 1. Deliberate Indifference to Serious Medical Needs

To prevail on his claims against Dr. Smash, Dr. Howard and Dr. Troutt, Plaintiff must demonstrate: (1) objectively, the harm he complains of is sufficiently "serious" to merit constitutional protection and (2) Defendants were subjectively aware of a substantial risk to Plaintiff's health or safety and acted in purposeful disregard of that risk. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Sealock*, 218 F.3d at 1211; *see also Estelle*, 429 U.S. at 104–105 (deliberate indifference is manifested by prison personnel "intentionally denying or delaying access to medical care").

The potential harm from Plaintiff's uncontrolled tonic clonic and psychogenic seizures is serious enough to merit constitutional protection. The question, then, is whether any or all of these defendants possessed the requisite state of mind to constitute deliberate indifference to Plaintiff's serious medical needs.

### 2. The Medical Records

The medical records are voluminous. They chronicle Plaintiff's attempts to obtain prescriptions for two seizure-control medications: Klonopin for his psychogenic seizures and Neurontin for his tonic clonic seizures.

An entry in the medical records dated September 16, 2011, states Plaintiff had failed to take his "psych meds" (Doxepin) three times that week, but Plaintiff had taken the medication that evening. Dr. Smash was notified. (SR Exhibit 15 at 196). On September 22, 2011, Plaintiff signed a Waiver of Treatment indicating his refusal to take "Doxepin all psych meds." (*Id.* at 199). On October 2, 2011, Plaintiff submitted a Request for Health Services (RHS) stating Dr. Smash had "talked him into" signing the

waiter. Plaintiff requested that a different medication be prescribed. Dr. Smash replied, warning Plaintiff not to make ungrounded accusations against staff. (*Id.* at 207). Nevertheless, Plaintiff obtained a prescription for Celexa and Vistaril on October 14, 2011. (SR Exhibit 17 at 459; Exhibit 15 at 230, 238). On November 16 and 21, 2011, entries in the medical record note "Offender non-compliant taking psych drugs." (SR Exhibit 15 at 220-221). Thereafter, Plaintiff signed a second waiver refusing to take any drugs offered by Dr. Howard. (*Id.* at 227).

Plaintiff requested an appointment with Dr. Troutt, and Dr. Troutt examined Plaintiff on October 18, 2011. Dr. Troutt recorded the following subjective data:

> History of seizures for 23 years. Medicated for seizures for 18 years. Last saw neurologist 2000 Dr. Dewitt in Tulsa. Records pending. Last MRI in August while not incarcerated. Offender with left inguinal pain. No bulge identified. Pain with lifting lower abdomen. Pain constant but increases with lifting. No blood in stool. Colonoscopy 2008. Normal colon at that time. Recommendations for repeat 10 years. Ultrasound of abdomen normal. History of pseudo seizure.

(*Id.* at 215). Dr. Troutt initiated "hep C protocol,"[5] and noted he would await Dr. Dewitt's records. He also noted he would "repeat neuro consult prn." (*Id.*). Plaintiff submitted another RHS on November 7, 2011. Plaintiff's appointment was the next day. Dr. Trout's notes from the appointment state Plaintiff "does not know why he is here today." Dr. Troutt identified seizures, stemming from a head injury some 30 years before, as Plaintiff's chief complaint and noted Plaintiff's last seizure was on September

---

[5] The medical records demonstrate that Plaintiff received regular blood tests throughout the time relevant to this case.

15

25, 2011. Dr. Troutt noted Plaintiff's seizure medication had been discontinued at LARC. He further noted a history of pseudoseizures. (*Id.* at 218). Under the "Plan" section of the medical form, Dr. Troutt wrote:

> Discussed neurology consult vs. waiting for old records for review. Offender wants to await obtaining the records for review instead of obtaining current neurology consult. Notify of seizures or complications from seizures. Offender wants to wait for records.

(*Id.* at 218). Plaintiff filed an RHS on December 27, 2011, complaining of right knee pain allegedly arising from a stab wound inflicted by the drug task force. (*Id.* at 234).

On January 18, 2012, Plaintiff reported a seizure from which he awoke on the floor with his foot pinned between the side of the bed and the mattress. He complained of knee pain, but did not specify which knee. The handwritten notes at the bottom of Plaintiff's RHS seem to be about how to respond to an RTS: "on request of staff check no-to lawsuit but add note under box that it is [undecipherable] county jail your info from Littletree is here but not Cleveland – the Littletree inf in on your electronic chart." (*Id.* at 240).

On January 24, 2012, Plaintiff was attended by Sharon Kay Kunzman, RN. Plaintiff's chief complaint concerned his seizures, which he reported having about twice a week. He reported that the last one he had had was "Grand-Mal Type." Ms. Kunzman noted Plaintiff had talked to the doctor in the past and was scheduled to see Dr. Troutt on February 1, 2012. (*Id.* at 242).

Plaintiff went to his appointment with Dr. Troutt on February 1, 2012. Plaintiff's chief complaint was seizure activity and "traumatic injury to lower extremities." The "Plan of Action" demonstrates Dr. Troutt would review previous records concerning seizures and pseudoseizures and order an X-ray of Plaintiff's right knee. Dr. Troutt noted he would also "check workup for abdominal pain and repeat tests for further workup." (*Id.* at 247). An X-ray of Plaintiff's right knee was performed on February 8, 2012. (*Id.* at 249-250). The results indicated soft tissue swelling, without fractures or dislocations. No bony erosions or destructive changes or radiopaque foreign bodies were seen. (*Id.* at 252). On February 10, 2012, Plaintiff submitted an RHS stating he had had a seizure at work the previous day and stated the X-ray was performed on the wrong leg. (*Id.* at 253).

On February 22, 2012, Plaintiff submitted an RHS stating he had had a seizure at work that day and another over a week before, in which he hurt his left leg. He repeated his assertion that the X-ray was taken of the wrong leg. The response stated, correctly, that Plaintiff had first complained about his right leg. (*Id.* at 254; 259).

Dr. Troutt prescribed Neurontin the same day, ordered a neurological consultation and stated he would await the neurologist's recommendation before administering further treatment. (*Id.* at 258; 280). Dr. Troutt requested a neurological consultation with physicians at the Oklahoma University Health Sciences Center (OUHSC). Plaintiff continued to have what he referred to as "pseudoseizures." (*Id.* at 261-267). Plaintiff was examined by Dr. Troutt on March 14, 2012. Dr. Troutt noted

Plaintiff's contention that he was still having pseudoseizures, but had not had a "grandmal" since he had started taking Neurontin. Dr. Troutt stated he would recheck Plaintiff's seizure history after the neurology consultation. He ordered an X-ray of Plaintiff's left knee. (*Id.* at 268). The X-ray was negative for fractures, dislocations or soft tissue injury. (*Id.* at 271).

On March 12, 2012, Plaintiff submitted an RHS requesting an appointment with Dr. Howard regarding medical treatment of his pseudoseizures. The reply stated his seizures would be addressed through medical first. (*Id.* at 270). Plaintiff submitted another RHS on March 17, 2012. The response by Dr. Smash stated Plaintiff could only schedule an appointment with Dr. Howard through Dr. Smash, himself. Dr. Smash recommended Plaintiff submit an "RTS" to Ms. Frech, CHSA, if he thought his medical services were "not as they should be." (*Id.* at 269). The notes from Dr. Howard's appointment with Plaintiff state, "PT DESIRES KLONOPIN." (*Id.* at 280). Notes from Dr. Troutt dated April 4, 2012, also report Plaintiff's desire for Klonopin and Neurontin to control both types of seizures. (*Id.* at 285).

Plaintiff submitted another RHS reporting another seizure on May 11, 2012, and inquiring about his appointment with the neurologist. The reply stated there was a long waiting list for the neurologist and implored Plaintiff to be patient. (*Id.* at 296). Plaintiff had another seizure on May 23, 2012. A nurse witnessed the seizure and described it in her notes. (*Id.* at 304.) Plaintiff reported having had five seizures the latter part of April and three in May as of May 7, 2012. (*Id.* at 313).

18

On July 7, 2012, Plaintiff had another seizure witnessed by a nurse who noted Plaintiff had missed two doses of Neurontin and regularly missed the morning dose of Neurontin every sixth or seventh day. When Plaintiff arrived to get his evening dose of Neurontin, he reported having had three seizures that day. (*Id.* at 331).

Plaintiff continued having seizures in the late summer and fall of 2012. On December 12, 2012, Plaintiff was taken to OUHSC for a neurological consultation. He was examined by a board-certified neurologist, Dr. Cherian Karunapuzha, and Dr. Leonides Bermejo, a Resident doctor in the neurology department. By this time, Plaintiff had been taking Neurontin for about ten months. His tonic clonic seizures were controlled, when he took Neurontin regularly, and his main concern was his psychogenic seizures. The Neurologists' report confirmed a diagnosis of generalized tonic clonic seizures and noted these seizures had been controlled by Gabapentin. The neurologists' assessment confirmed Plaintiff suffered from two types of seizures:

> Assessment:
>
> -psychogenic non-epileptic seizures (PNES)
>
> -generalized tonic clonic seizures
>
> -anxiety disorder.

(*Id.* at 355). Plaintiff reported having previously taken Klonopin for his psychogenic seizures. Dr. Karunapuzha and Dr. Bermejo explained to Plaintiff that benzodiazepines such as Klonopin are not recommended for long-term use. (*Id.*). Plaintiff was advised he would need to get psychiatric help for medication to control his anxiety and would

likely need psychological counseling as well. (*Id.*). Dr. Karunapuzha referred Plaintiff to the psychiatric department for medication to control his psychogenic seizures. (*Id.*). He did not, however, suggest Plaintiff's Neurontin be discontinued.

After Plaintiff's appointment at OUHSC, Dr. Troutt told Plaintiff he would be referred to Dr. Howard, for control of psychogenic seizures. Then, on January 2, 2013, for reasons nobody understands, Dr. Troutt discontinued Plaintiff's Neurontin. (*Id.* at 356). Plaintiff submitted a RHS on February 2, 2013, asking for a prescription for Neurontin to control his generalized tonic clonic seizures. (*Id.* at 358).

It appears Dr. Troutt either misread, misunderstood or disregarded the assessment of the neurologists, who clearly stated Plaintiff suffers from both tonic clonic and psychogenic seizures. On February 7, 2013, Plaintiff had another appointment with Dr. Troutt. Dr. Troutt's diagnosis on this date was "pseudoseizures." He did not include tonic clonic seizures in his diagnosis, even though the neurologists had. (*Id.* at 362).

On February 2, 2013, Dr. Howard's medical record notes Plaintiff again seeking Klonopin for his psychogenic non-epileptic seizures. Just two months before, however, the neurologists at OUHSC had counseled Plaintiff against taking Klonopin for long-term control of his psychogenic seizures. Dr. Howard noted he would contact his supervisor about approved psychogenic drugs. (*Id.* at 359).

Plaintiff filed an RHS again seeking Neurontin on February 19, 2013. (*Id.* at 369). He was scheduled to see Dr. Troutt, but Plaintiff did not show up for the appointment.

(*Id.* at 368). Plaintiff asked Dr. Troutt for Neurontin again on March 20, 2013. (*Id.* at 369). An appointment was scheduled.

 On April 1, 2013, Dr. Howard noted, "PT states that he has no desire for me to prescribe any of the psychotropic medication choices that I offered him." (*Id.* at 372).

On April 29, 2013, a nurse recorded witnessing another seizure, this one lasting 45 minutes. (*Id.* at 373-374). On May 2, 2013, Dr. Troutt examined Plaintiff, again assessing him with a "history of pseudoseizures" and no mention of tonic clonic seizures. According to Dr. Troutt's notes, the April 29, 2013 seizure was the first of its kind in over a year. (*Id.* at 380-381). On May 29, 2013, Plaintiff again requested a prescription for Neurontin. A copy of the neurological consultation is again in the record, apparently having been reviewed by Dr. Troutt, who responded

> Per neurology recommendations, psych for anxiety, see neurology recommendations, see psych recommendations, Offender does not want any medication for his BP at this time, notify of recurrence of problem, return to psych prn, neurologist repeat apt prn.

(*Id.* at 384).

In response to an RHS dated June 17, 2013, asking to see the PA, a nurse replied that Plaintiff would be scheduled to see whatever doctor was available. (*Id.* at 387). Plaintiff refused an appointment with Dr. Troutt on July 3, 2013. (*Id.* at 389).

Plaintiff was again referred to OUHSC on August 21, 2013, where he was examined by Dr. William Bendure and Dr. Vaughn in the neurological clinic. (*Id.* at 394-403) Dr. Bendure's assessment of Plaintiff's neurological status was the same as that of

the previous neurologists. Dr. Bendure noted that Plaintiff's Gabapentin had been discontinued for "uncertain reasons." Dr. Bendure ordered a "quick titration" of Gabapentin to build the amount of medication in his blood stream quickly to control his tonic clonic seizures. He also advised continued therapy for Plaintiff's anxiety and psychogenic seizures and suggested Zoloft, but stated Plaintiff did not want anything except Klonopin. Dr. Bendure counseled Plaintiff against long term use of Klonopin. (*Id.* at 394-403).

According to Defendants' brief, in October 2013, Plaintiff submitted a corrected grievance to Ms. Frech requesting to be put back on Neurontin, which Ms. Frech granted. (ECF No. 66:42). On October 2, 2013, over a month after Dr. Bendure ordered the "quick titration" of Gabapentin, Dr. Troutt followed Dr. Bendure's instructions. (SR Exhibit 17 at 459). On October 9, 2013, Dr. Troutt requested non-formulary Neurontin for Plaintiff, stating Gabapentin was not effective. (SR Exhibit 15 at 413).

Plaintiff continued to seek medication from Dr. Howard to control his psychogenic seizures. (*Id.* at 419; 431 435). On March 14, 2014, Dr. Howard prescribed Zyprexa and discontinued Plaintiff's prescription for Vistaril. Dr. Howard reported Plaintiff "seemed elated as a result." (*Id.* at 437).

Plaintiff's claim of deliberate indifference to Plaintiff's serious medical needs concerning Dr. Howard, is based on the latter's refusal to prescribe Klonopin instead of Vistaril. According to Plaintiff, Dr. Howard conferred with his "boss," Defendant Dr.

"Shriner,"[6] who would not sanction prescribing Klonopin, the anti-anxiety medication Plaintiff preferred. (ECF No. 25:9-10).

### 3. Defendants Howard and Smash

As the psychiatrist for JCCC, Dr. Howard was responsible for prescribing anti-anxiety medication and antidepressants to Plaintiff. Dr. Smash, the psychologist at JCCC, was responsible for psychotherapy and scheduling appointments with Dr. Howard when necessary.

Before Plaintiff was incarcerated, he apparently had been prescribed Klonopin to control his anxiety and the psychogenic seizures caused by his anxiety. Dr. Howard would not prescribe Klonopin, but, as demonstrated by the health records, he offered an array of alternative psychotropic drugs, none of which satisfied Plaintiff.

Dr. Howard's decision to prescribe psychotropic medication other than Klonopin was supported by the opinions of the neurologist at OUHSC. All of them counselled against the long term use of Klonopin to control anxiety and psychogenic seizures.

---

[6] On February 5, 2015, the undersigned entered an order addressed to Dr. "Shriner" giving him seven days to show cause as to why default judgment should not be entered against him for failing to enter an appearance. The Court's docket (ECF No. 34) indicated service had been effected on this defendant. On February 10, 2015, Dr. Derral Schreiner entered his appearance (ECF No. 98) and in an Affidavit attached to the entry of appearance (ECF No. 98-1) stated he had never received service or actual notice of this suit against him. He stated the certificate of service was signed by Dr. Morgan who was not authorized to accept service on his behalf and never notified him of the suit against him. Dr. Schreiner's only involvement in this case was as a supervisor of Dr. Howard. Plaintiff has, therefore, failed to demonstrate Dr. Schreiner personally participated in any violation of Plaintiff's rights. It is recommended that the claims against Dr. Schreiner be dismissed under the screening statutes, *see* 28 U.S.C. §§ 1915A and 1915(e)(2)(B)(2) (pertaining to actions brought in forma pauperis) for failure to state a claim upon which relief may be granted.

Plaintiff's claims against Dr. Howard and Dr. Smash are based on nothing more than a disagreement regarding which antianxiety drug Plaintiff should take. Plaintiff clearly wanted Klonopin. Dr. Howard disagreed and refused to prescribe it. A difference in medical opinion regarding treatment does not amount to an Eighth Amendment constitutional violation. *See Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002) (concluding that a "medical difference of opinion ... is not actionable under the Eighth Amendment"). It is therefore recommended that summary judgment be granted to Dr. Howard and Dr. Smash.

### 4. Dr. Troutt

Plaintiff's allegations against Dr. Troutt are centered on Plaintiff's need for Neurontin to control his tonic clonic seizures. Dr. Troutt first asserts Plaintiff has failed to state a claim upon which relief may be granted, or, alternatively, that he should be granted summary judgment. Based on the medical records included in the Special Report, the undersigned disagrees.

The medical records are replete with notations of Plaintiff's seizures and Dr. Troutt's delay in prescribing Neurontin. After the particularly severe seizure in February 2012, and after Dr. Troutt had received medical records from outside sources, Dr. Troutt finally prescribed Neurontin and scheduled the first of two appointments to see a neurologist. Plaintiff was afforded numerous appointments with Dr. Troutt. But the magnitude of the medical records alone does not demonstrate that Dr. Troutt's treatment was sufficient to meet the standards of the Eighth Amendment. Common

sense dictates that withholding medication to control seizures presents a serious risk of harm to the prisoner---one that is so obvious that even a lay person would easily recognize the necessity for treatment, and is, therefore, sufficiently serious to warrant Constitutional protection under the Eighth Amendment. Dr. Troutt discontinued Neurontin after Plaintiff's examination by specialists confirmed the diagnosis of generalized tonic clonic seizures. Dr. Troutt's actions are not a simple disagreement regarding proper medication. Dr. Troutt discontinued medications approved by a specialist. The undersigned can think of no explanation for Dr. Troutt's actions other than his, either willfully or recklessly, disregarding an excessive risk to Plaintiff's health or safety.

Dr. Troutt contends he is entitled to qualified immunity. After a defendant invokes qualified immunity, the plaintiff in a case like this one, which alleges a violation of the Eighth Amendment, must demonstrate that the defendant's actions violated a specific constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the plaintiff fails to meet his burden on this threshold inquiry, the qualified immunity inquiry comes to an end. *Id.* If, as in this case, the plaintiff meets this initial burden, he must then show that the constitutional right was "clearly established" prior to the challenged action. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (internal quotations omitted). "[T]here is little doubt that deliberate

indifference to an inmate's serious medical need is a clearly established constitutional right[.]" *Mata v. Saiz*, 427 F.3d 745, 749-50 (10th Cir. 2005).

The question regarding qualified immunity in the summary judgment context is whether, viewing the evidence in the light most favorable to Plaintiff, the facts demonstrate that the defendant's actions violated Plaintiff's Eighth Amendment rights. *Saucier*, 533 U.S. at 201; *Gonzales v. Martinez*, 403 F.3d 1179, 1185–86 (2005). The answer in this case is "yes." Dr. Troutt is not entitled to qualified immunity.

Dr. Troutt next contends that Plaintiff did not exhaust his administrative remedies. The Prison Litigation Reform Act requires a prisoner to exhaust available administrative remedies before bringing a civil rights action in Federal court:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As Defendants note, Plaintiff filed a myriad of incorrect documents and filed them with the wrong people. As discussed in further detail below, some of Plaintiff's claims should be dismissed because they are unexhausted. But Defendants themselves state in their brief that in October 2013, Plaintiff submitted a corrected grievance to Ms. Frech requesting that he be prescribed Neurontin, and Ms. Frech granted relief. (ECF No. 66:42).

Once relief was granted, Plaintiff had exhausted his administrative remedies as to his claim that Dr. Troutt's discontinuation of Neurontin violated the Eighth Amendment.

Thus, it is recommended that Defendant Troutt's Motion for Summary Judgment be denied.

## IV.    Disposition of Count II

In Count II, Plaintiff contends "the defendant Dept. of Corrections, et al." conspired with defendants in a law suit against the Pawnee County Jail that "directly relates" to this civil rights action. He alleges defendants used the DOC grievance procedure "that does not apply to the Pawnee County Complaint" to block his access to the courts. (ECF No. 25:6).

Although Plaintiff alleges a conspiracy to thwart his ability to exhaust his administrative remedies, the only named defendant in Count II is Ms. Frech, the Health Services Administrator at JCCC. The DOC is not named as a defendant in this action. Plaintiff's claim against Ms. Frech is based on her having denied, returned unanswered, or granted Plaintiff's requests to staff or grievances. But as noted above, merely denying grievances or requests to staff does not constitute "personal participation" that will support a cause of action under § 1983. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). Moreover, when relief sought in a Request to Staff or Grievance is granted, a prisoner cannot then say he has been denied access to the grievance policy. For these reasons, the claims against Ms. Frech should be dismissed.

27

## V.     Disposition of Count III

In Count III, Plaintiff alleges his Fourth, Sixth, and Fourteenth Amendment rights, as well as his privacy rights under the Health Insurance Portability and Accountability Act (HIPAA), were violated by Dr. Troutt and Ms. Frech who allegedly sent copies of his medical records to the DOC which, in turn, forwarded the medical records to defendants in a federal law suit against the Pawnee County Jail. (ECF No. 25:12). Defendants Denise McCoy, DOC's Medical Services Administrator, and Sammie Kenyon, an employee of DOC, are also implicated in Count III, though Plaintiff has stated no facts to demonstrate their personal participation in the alleged violation of privacy rights.

Defendants contend the claims in Count III should be dismissed for failure to state a claim for which relief may be granted. They are correct.

In enacting HIPAA, Congress "mandated the establishment of national standards for protection of the privacy of individually identifiable health and medical information." *See Wallin v. Dycus*, 2009 WL 798839 (D. Colo. Feb. 25, 2009, slip copy). Consistent with this statutory mandate, the Department of Health and Human Services (HHS) promulgated rules and regulations governing the release and transmittal of "individually identifiable health information" by health care providers. *See* 45 C.F.R. 160.101 et seq. However, all courts to consider the matter, including the Tenth Circuit Court of Appeals, have held that HIPAA does not create a private right of action. *See Wilkerson v.*

*Shinseki*, 606 F.3d 1256, 1267 n. 4 (10th Cir. 2010) (citing *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006) ("We hold there is no private cause of action under HIPAA.").

Second, Plaintiff's claim under the Fourth, Fifth, Sixth and Fourteenth Amendments is based on the general constitutional right to privacy recognized by the Supreme Court of the United States as well as the Tenth Circuit Court of Appeals which "has repeatedly interpreted the Supreme Court's decision in *Whalen v. Roe*, 429 U.S. 589 (1977), as creating a right to privacy in the non-disclosure of personal information." *Herring v. Keenan*, 218 F.3d 1171, 1175-76 (10th Cir. 2000) (citations omitted). But a prisoner's right to privacy in his medical records is not unlimited. While "prison inmates do not shed all fundamental protections of the Constitution at the prison gates," *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974), they retain only those rights that "are not inconsistent with their status as prisoners or with the legitimate penological objections of the corrections system." *Id.* (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). *See also Franklin v. McCaughtry*, 110 Fed. Appx. 715, 719 (7th Cir. 2004) (unpublished) (citation omitted) (Prisoners "at best have very limited privacy rights."); *Cortes v. Johnson*, 114 F.Supp.2d 182, 185 (W.D.N.Y. 2000) (Prisoners do not have a constitutional right to complete confidentiality of medical records).

Plaintiff put his medical records at issue when he filed suit against the Pawnee County Jail in federal court. Defendants were ordered to file a special report including Plaintiff's medical records. *See Lemmons v. Waters*, No. 11-500-JED-PJC, Doc. No. 32 at 8 (Oklahoma, ND, January 13, 2012). The medical records were filed under seal.

Plaintiff's allegations regarding alleged violation of his privacy rights do not state a claim upon which relief may be granted. Accordingly, the Count III claims against Defendants Troutt, Frech, McCoy and Kenyon should be dismissed with prejudice.

## VI. Disposition of Count IV

Count IV is a hodgepodge of claims against various defendants loosely alleging denial of access to the courts. The underlying claim is based on Plaintiff's attempt to file a suit pursuant to the Oklahoma Governmental Tort Claims Act in the District Court of Alfalfa County.

It is well established that prison officials must provide access to the courts to prisoners. *Bounds v. Smith*, 430 U.S. 817, 828 (1977). *See also* U.S. Const. amend. I (protecting the right of the people "to petition the Government for a redress of grievances"); *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (stating that "prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts"). However, in stating a claim for denial of access to the courts, a plaintiff must demonstrate he suffered actual harm resulting from the denial of access to the courts. *Lewis v. Casey*, 518 U.S. 343-349 (1996).

Following is a summary of Plaintiff's allegations regarding his difficulties in filing his Alfalfa County suit.

Plaintiff submitted an RTS dated June 2, 2013, to JCCC Librarian Defendant Felicia Harris requesting "all the information to file a claim under the Oklahoma Tort

Claim Act for harm as a result of negligence of a state facility." (ECF No. 25-1:50). Ms. Harris responded to Plaintiff stating his request was not a grievable issue and in any case, she did not have forms on file. (*Id.*) On June 14, 2013, Plaintiff submitted a second RTS to Ms. Harris containing four issues (*Id.* at 51). Ms. Harris returned the RTS unanswered because it contained more than one issue. She instructed Plaintiff to resubmit the RTS. (*Id.* at 52).

Plaintiff submitted a "Notice of Intent to Sue Pursuant to the Oklahoma Tort claims Act" for mailing on June 21, 2013. (*Id.* at 53-56). On one of the notices Plaintiff wrote, "Please stamp filed and return after receipt of certified mail." (*Id.* at 53). Plaintiff's notices were mailed June 24, 2013. (*Id.* at 59). But Plaintiff did not receive the return receipts he was expecting. He sent an RTS to the mailroom on June 28, 2013, asking for the receipts. Defendant Sackett responded that at Plaintiff's request, the notices were mailed by certified mail. She provided Plaintiff with the certified numbers. (*Id.* at 60).

Plaintiff submitted an RTS to Mr. Brooks, Assistant Warden, on July 3, 2013, complaining about the actions of Ms. Harris and Ms. Sackett. Mr. Brooks replied on July 15, 2013, stating, "If you have already attempted to resolve this issue through an RTS to F. Harris, you will need to use the RTS to initiate the grievance procedure." (*Id.* at 57). Mr. Brooks also explained why Plaintiff's mail was sent out as "certified," and again provided Plaintiff with the certified mail numbers. (*Id.* at 59).

Plaintiff then submitted an RTS to Defendant Janet Dowling, identified as Warden of JCCC apparently addressing the same issue. Ms. Dowling stapled Mr. Brooks' reply to the RTS and returned it to Plaintiff. (ECF No. 25:15).

Plaintiff submitted yet another RTS to Ms. Harris on July 13, 2013, requesting the address of the Office of Risk Management Administrator and the address for properly submitting a tort claim. Ms. Harris replied she did not have the addresses, but she gave Plaintiff an address where he could write for the information. (*Id.* at 25-1:69).

Plaintiff sent out his Notice of Intent to Sue to the defendants named in his state law case on July 24, 2013, this time with return receipts attached. (*Id.* at 75). On August 7, 2013, Plaintiff submitted another RTS to Ms. Sackett requesting the return receipt for one of the notices. Ms. Sackett replied she did not have the receipt, explaining the notice had been sent out after the others because she had to wait for a check from the business office because it was not "co-payable." (*Id.*). Plaintiff alleges Defendant Harris arbitrarily marked the notice as not co-payable. He claims defendants have thwarted his attempts to file paper work. (ECF No. 25:15). Plaintiff alleges that one defendant in his state court lawsuit was served one day late because of the actions of Ms. Harris and Ms. Sackett.

On August 8, 2013, Plaintiff sent an RTS to Ms. Harris asking for a copy of his legal documents from the state court. Ms. Harris replied, noting Plaintiff had received the documents in the mail on August 9, 2013. (ECF 25-1:84).

Plaintiff apparently mailed out five more notices and petitions on October 21, 2013, return receipt requested. He refiled an RTS to Ms. Sackett on November 15, 2013, asking for the receipts. Ms. Sackett replied she did not have them. (*Id.* at 117). Plaintiff alleges Ms. Harris denied his right to due process because she would not provide copies of his papers when he had no funds in his account. (ECF No. 25:19).

On November 24, 2013, Plaintiff submitted another RTS to Ms. Harris requesting a copy of his legal work. (ECF No. 25-1:131). Ms. Harris responded Plaintiff would have to have funds in his account to cover the cost of a copy. (*Id.* at 132).

Plaintiff submitted an RTS to Ms. Sackett on December 1, 2013, requesting certified mail confirmation numbers so he could file a complaint with the Postmaster General. (*Id.* at 136). Ms. Sackett returned the RTS unanswered as it is an issue that cannot be grieved. (*Id.* at 137).

Plaintiff sent an RTS to Ms. Harris asking that she not stamp the received date over the submitted date. (*Id.* at 138). Ms. Harris returned the RTS unanswered because the issue had previously been addressed. (*Id.* at 139). On December 25, 2013, Plaintiff sent an RTS to Ms. Harris asking why he was being charged for copies of his legal materials. (*Id.* at 140). Ms. Harris returned the RTS unanswered as she had previously answered his question. (*Id.* at 141).

Plaintiff submitted an RTS to Ms. Sackett on December 23, 2013, complaining his legal files were not mailed until eleven days after he submitted them, and complaining he had not received the control numbers. (*Id.* at 143). Ms. Sackett replied the mailings

were delayed because Plaintiff had not filled them out correctly. She also replied she did not have the return receipts. (*Id.*).

Two deficiencies are readily identifiable upon scrutiny of Plaintiff's access to the courts claim in Count IV. First, despite the number of requests to staff Plaintiff filed, Plaintiff did not file any grievance with the facility's reviewing authority, nor did he complete the process with a grievance appeal to the Administrative Review Authority. (*See* SR. Exhibit 4 at 90-106 (OP-090124)). Second, even if Plaintiff had exhausted his administrative remedies, it is evident he was ultimately able to file his suit in the Alfalfa County District Court.[7] He cannot, therefore, demonstrate actual injury because Plaintiff was not, in fact, denied access to the courts, and this claim should be dismissed.

## RECOMMENDATION

After careful consideration of the issues in this case, it is recommended that the Defendants' dispositive motion be **GRANTED** in part and **DENIED** in part. The claims against Defendant Does (unknown defendants), Defendant Jones in his individual capacity, and Defendant Schreiner ("Shriner") be **DISMISSED ON SCREENING** for failure to state a claim upon which relief may be granted. It is further recommended that claims against Defendant Houston be **DISMISSED** based on Plaintiff's failure to timely serve him pursuant to Fed. R. Civ. P. 4(m). Claims against Defendant Irwin

---

[7] The undersigned takes notice of the docket in Case No. CJ-2013-19, District Court of Alfalfa County, attached to the Special Report as Exhibit 1, which demonstrates Plaintiff's case was filed. The case was dismissed on March 11, 2013, and Plaintiff appealed. His appeal is currently pending in the Oklahoma Court of Civil Appeals. Case No. SD No. 112593. Because state litigation is pending, this Court should abstain from considering the pendent state law claims and should dismiss them without prejudice.

should be **DISMISSED** because she is entitled to Judicial Immunity. Claims against Defendants Dowling, McCoy, Brooks and Frech based on their having denied requests to staff, grievances or grievance appeals should be **DISMISSED** for failure to state a claim upon which relief may be granted. It is recommended that the Motion to Dismiss or Motion for Summary Judgment of Defendants Frech, Harris, Howard, Patton, Sackett, and Smash **(ECF No. 66)** be **GRANTED**. **With regard to the claims against Dr. Troutt in Count I of Plaintiff's Second Amended Complaint, it is recommended that the Motion to Dismiss or Motion for Summary Judgment (ECF No. 66) be DENIED.** Finally, as to Count IV of Plaintiff's Second Amended Complaint, it is recommended that the Court abstain from considering state law claims of negligence and dismiss them without prejudice because litigation on these claims is pending in state court. **Thus, the only surviving claim of Plaintiff is against the Defendant, Dr. Troutt, as alleged in Count I of Plaintiff's Second Amended Complaint**.

## NOTICE OF RIGHT TO OBJECT

The parties are hereby advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court by **March 9, 2015**, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal questions contained herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

**STATUS OF THE REFERRAL**

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED** on February 19, 2015.

_____
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE